HARDY, Judge.
This is a suit by plaintiff, Mrs. Lorraine Solomon, and husband, Earl W. Solomon, for the recovery of damages, medical expenses, etc., allegedly sustained by reason of,the negligence of the driver of a truck owned by defendant’s assured. After trial there was judgment in favor of plaintiff wife in the total sum of $7,419, represented by the sum of $6,500 for personal injuries, plus the additional amount of $919 for damages sustained by her automobile, and for thé plaintiff husband in the sum of $1,183.05, being the total amount of medical expenses for which he was .obligated for treatment of his wife. From this judgment defendant has appealed and plaintiffs have answered the appeal, praying for an increase in the amount of the judgment allowed for personal injuries.
The accident which gave rise to this suit occurred at or about the hour of 12:00 o’clock noon, April 5, 1955, at a point in Winn Parish known as the St. Maurice Community where U. S. Highway No. 71, < running generally north and south, is intersected from the east and west by Louisiana Highway No. 480. A 1953 Pontiac Sedan, the separate property of plaintiff wife, driven by her husband, proceeding south on U. S. Highway Np. 71 at a speed of about fifty miles per hour, struck a dump truck loaded with five yards of native gravel weighing approximately 2,700 pounds per yard, which was being driven east along State Highway No. 480, across Highway 71. The point of impact involved the right front of the Pontiac automobile and the left rear of the truck, the exact location being on Highway 480 about one foot east of the eighteen foot wide paved slab of Highway 71. It should be noted that Highway No. 480 does not make a straight crossing at the intersection in question, the continuation of Highway 480, to the east of Highway 71, being slightly *790 south of the intersection on the west side thereof.
There were only three eye witnesses to the accident, these being the plaintiffs and the driver of the gravel truck, one Miron B. Parker, an employee of the Winn Parish Police Jury, the defendant’s assured. Indeed, there were only two eye witnesses to the actual collision, inasmuch as Parker testified that he never did see plaintiff’s automobile until after the collision and until after he had gotten out of his truck. For a case of this nature there is surprisingly little conflict in the testimony of these three parties. The testimony of plaintiffs is that they were driving at a speed of approximately forty-five miles per ■hour; that both saw the Parker truck approaching the intersection from the west at a very slow rate of speed and, according to the plaintiff husband, the driver of the truck, Parker
“ — looked like he looked right at me and I assumed that he was going to stop.”
The plaintiffs further testified that when Parker continued to drive the truck, which was nineteen feet long, out onto the highway blocking the entire slab, Solomon, the • driver of the Pontiac, immediately applied his brakes and tried to move to the left, hoping to miss the truck. The Solomon car skidded eighty-five feet from the point of effective application of the brakes to the point of impact, and, from the appearance of the skidmarks, it is established that the car was angling off the highway to the left during this entire distance. Neither of the plaintiffs, according to their testimony, observed Parker bring his vehicle to a stop before he moved out into the intersection. On the other hand, Parker testified that he brought his truck to a stop some fifteen or twenty feet west of the paved slab of the highway, looked to his left, then to his right and, perceiving no traffic approaching from either direction, put his truck in gear and moved out onto the highway without again making any observation to his left, that is to the north, from which direction plaintiffs’ car was approaching. As stated above, Parker frankly testified that he never d'id see plaintiffs’ automobile prior to the actual collision.
Certain pertinent physical facts established without dispute are that from the point of intersection Parker had a clear view of Highway 71 for a distance of 440 yards to the north, but the view of the intersecting road on which Parker was traveling is somewhat obscured from full view by southbound travelers on the highway by a large tree and a fence. It is noted in the written opinion of the district judge that he also includes, in listing these obstructions, a large sign erected on or near the edge of the highway at the intersection. Counsel for defendant insists that this sign is located south of the intersecting road and therefore would not obstruct the view of drivers of vehicles approaching from the north. There is no testimony on this point, and, because of the unreliable perspectives of the photographs introduced in evidence, we are unable to determine which of these opposed statements is accurate. However, we do not consider this point to be particularly material in view of the fact that the existence of some obstruction to the view is quite clear. Solomon testified that he first saw the truck moving along the road “through the trees.”
As we consider this matter, it is necessary to resolve, first, whether Parker was guilty of negligence in attempting to drive his truck across the intersection in the path of the approaching Pontiac automobile. We have had not the slightest difficulty in concluding, as did the district judge, that he was guilty of negligence in this respect, which negligence was the sole and proximate cause of the accident. It is true that Parker testified that he moved 71 feet, from the point where he stopped to the point of impact, at a speed of three to four miles per hour and that, subsequently re-enacting his actions, he timed this maneuver as consuming fifteen seconds. From this testimony counsel for defendant attempts to justify the conclusion that Parker was free of negligence in attempting to negotiate the crossing of the main *791 highway. We cannot find, under any rule of reason, how such a conclusion can be sustained. On the contrary, it is clearly evident, even if the plaintiffs’ automobile was not in view for a distance of 1,320 feet at the time Parker first looked to the north, it must have come into view before he completed his actions in making observation to the south, putting his truck in gear and moving slowly up to and across the highway. It follows that his failure to again look to the north, under the circumstances, was gross negligence. Time after time our courts have reiterated the principle that a motorist discharges only part of his duty by stopping before attempting to negotiate an intersection. A recent pronouncement by this court in Chase v. Burley, 76 So.2d 587, 590, is appropriate:
“ * * * there seems to be a somewhat prevalent idea among automobile drivers to the effect that when one has brought a vehicle to a stop, as required by law, before entering an intersection with a favored street he has fulfilled the requirements of the law. This is but a part, indeed the least effective part, of a motorist’s duty. The very purpose of stopping is to permit the opportunity for a full and complete observation in both directions along the favored street in order to ascertain the presence of approaching traffic which might interfere with free and safe passage across such a favored highway.”
Conceding that Parker made some observation to the north, it is obvious that this observation was not full and complete, and his failure to continuously observe the highway in both directions before driving a large, awkward, cumbersome, slow-moving vehicle into a customarily heavily traveled main highway, is sheer negligence.
The second question which is presented to us for consideration concerns the contention of contributory negligence on the part of Solomon, the driver of the Pontiac. We find no basis whatsoever upon which a conclusion of negligence in this respect could be sustained. Both plaintiffs testify that their speed was approximately forty-five miles per hour and this estimate is further supported in the testimony of Parker himself to the effect that immediately after the collision, when he asked Solomon how fast he was driving, the reply was:
“ — about forty-five miles.”
■Nor is there any substance in any other testimony or in the physical facts which would indicate any substantial error in fixing forty-five miles per hour as the approximate speed of the Solomon vehicle. However, in this connection, the speed of the Solomon car comprehends no element of negligence, no matter if it should be fixed at sixty miles per hour. The assumption of the driver, perceiving a slow-moving, heavily loaded truck approaching the highway, that it would be brought to a stop before proceeding thereupon directly in his path, is amply justified.
We think, under the facts, which are much more clearly and certainly established than is the usual experience in automobile collision cases, there can be no question as to the correctness of the conclusion of the district judge that the accident was caused by the negligence of the driver of the truck and that plaintiffs were free from any contributory negligence.
There remains for resolution the difficult question of quantum of damages, which has been placed at issue on this appeal by plaintiffs’ answer seeking an increase in the amount allowed in response to the personal injuries. There is no contest as to the judgment for medical expenses in favor of plaintiff husband, who did not sustain and makes no claim for personal injuries to himself, nor as to the amount allowed for damages to the automobile which was the separate property of plaintiff wife. Eliminating these items from consideration, we are called upon to determine whether the sum of $6,500, adjudicated by our learned brother of the district court, was inadequate, as contended by plaintiffs, or excessive, as urged by counsel for defendant.
The principal injuries sustained by Mrs. Solomon were a fracture through the low *792 er third of the left humerus, in which a piece of bone had been knocked off the shaft, necessitating an open reduction and a fixing of the fracture with three metal screws, and a serious and troublesome laceration of the left side of the face extending from a point about one inch in front of the lubule of the ear, in a curving line, down to a point about one-fourth inch “medial to center of the naso-labial fold.” This laceration has left a perceptible and disfiguring scar about 3}/£ inches in length. Additionally, Mrs. Solomon sustained a number of minor facial lacerations which have left scarcely perceptible scars. To add to the pain, suffering and permanent disfigurement and disability for which damages are claimed by reason of the above described injuries, an additional element of damage arises from the fact that at the time of the accident Mrs. Solomon was eight months pregnant, and, naturally, sustained serious worry and concern as to the possible effect of the shock of the accident and her injuries upon the condition of her unborn child, which, fortunately, showed no resultant injurious effects upon its birth' approximately one month following the accident.
Immediately following the accident Mrs. Solomon was removed to Natchitoches where she underwent emergency treatment and suturing of the major facial laceration; she was transported the same evening by ambulance from Natchitoches to the North Louisiana Sanitarium, in Shreveport, where she was hdspitalized for approximately ten days, the operation for the open reduction being performed the, day following the accident. A short time after being released the patient was forced to return to the hospital where it was determined that one of the screws, with which the fracture had been affixed, had pulled loose, which development required the removal of the plaster splint and the application of a hanging cast on April 18th. For a period of several weeks between the time of ápplication of ’ the hanging cast and its removal Mrs. Solomon was forced to sleep in a sitting position. The birth o.f her baby on-May 3rd occurred during this period and, following this event, she was unable to give the baby her personal care and attention for a considerable period of time. At the time of the trial, about the middle of September, 1955, more than five months after the accident, Mrs. Solomon testified that she was still suffering intermittent pain and limitation of use of the arm. The medical testimony indicates that there will be a permanent, though not serious, limitation of use of the left arm as the result of the accident. As the result of the operation for the reduction of the fracture there is an unsightly scar extending along the back lower area of the upper arm to a point at or just below the elbow joint.
The healing of the serious facial laceration sustained by Mrs. Solomon was marked by complications involving the obstruction of the parotid gland, which caused periods of severe pain and which necessitated the administration of ten deep therapy x-ray treatments. Additionally, Mrs. Solomon’s injuries have necessitated numerous physiotherapy treatments.
Summing up the elements of damage for which restitution is claimed, in addition to severe pain and suffering, shock and worry with reference to her unborn child, a slight permanent loss of function of the left arm and a small area of insensitivity on the upper lip, there must finally be added the substantial item of physical disfigurement caused by the ugly'scars on face and arm. We are impressed with the very restrained testimony of Mrs. Solomon with reference to the effect of these scars. She evidenced no disposition toward any hysterical or neurotic exaggeration but, on the contrary, simply testified in a very matter of fact fashion that these scars, particularly the facial disfigurement, where embarrassing and as a result she did not go out on social occasions as much as had been her custom before the accident. The photographs introduced in the record are eloquent testimony of the nature and effect of the scars and this is supported by the introduction in the record, on behalf of defendant, of a report made by Dr. Stewart DeLee of Shreveport, dated August 31, 1955, which we quote in full as follows: /
*793 “I examined the facial lacerations of Mrs. Lorraine Solomon today.
“Her lacerations apparently were caused by glass broken from the windshield of her automobile at the time of her accident in April of this year.
“There are five very small and barely visible lacerations of the forehead, nose and face. These small lacerations are visible only after close scrutiny at a distance of one foot.
“The large laceration of the left side of the face is visible from across the room. This large laceration extends from a point located about one inch in front of the junction of the lobule of the ear and the face and extends in a curving line the convexity of which is pointed down to a point located about inch medial to center of the naso-labial fold. This laceration is about Z1/2 inches long.
“The parotid gland is not palable on either side. The opening of the Paro-tid duct (Stenson’s duct) is not visible from inside the mouth on either side. These findings are of course normal.
“If the parotid duct was severed in the accident it must have healed itself or there is now a fistula communicating with the inside of the mouth which is functioning as the duct normally would. I doubt if the X-ray treatments would have destroyed the secretory cells of the parotid gland.
“She complains of numbness of a small area of the upper lip near the nasolabial fold. This numbness is probably caused by the severance of a tiny branch of the Superior labial nerve which is a branch oí the Infra orbital Nerve which is the terminal branch of the Maxillary Nerve which is a branch of the Trigeminal Nerve.”
. Additionally we think it helpful to quote from the report furnished to the -defendant by Dr. Willis J. Taylor, an orthopedic specialist of Shreveport, omitting only the recital of the patient’s history of the accident and the injuries sustained therefrom:
“The above named 31 year old white female patient was seen in the office on the afternoon of August 29, 1955. She complained of limited usefulness of the left arm and mentioned limited motion in the left elbow and reported aching occasionally at the site of the fracture in the upper arm.
* * * * * *
“Physical examination disclosed the patient to be a rather slender adult female of about the stated age. A healed laceration was noted above each eye on the forehead and another in the right supra-orbital region in the lateral browline. An indented scar, well bleached and approximately 3j4" in length, was noted on the left side of her face, curving upward from a point midway between the left nostril and the upper lip to a point anterior to the lobe of the left ear. There was no facial paralysis; however, she , complained of numbness anteriorly above the lip. Several small healed lacerations were noted on the antero lateral aspect of the right knee inferior and lateral to the,patella. Another healed laceration was noted on the anterior aspect of the right shoulder inferior to the acromion. It was noted that the right index finger had been amputated apparently in the mid portion of the proximal phalanx and the stump was noted to be insensitive and well padded. She stated that she was right-handed, and the power of grip was tested with a Dynomometer and was recorded as being 25 pounds of pressure on the right and 20 pounds of pressure on the left. One-quarter inch atrophy was measured in the left upper arm while the forearms were found to be equal in circumference. A 5}4" operative scar, well healed and apparently slightly sensitive in the upper portion, was noted on the posterior aspect of the left elbow, extending upward from the medial aspect of the olecranon. She complained of some ‘touchiness’ over *794 the ulna nerve of the posterior portion of the medial humeral epicondyle. It was found that the patient could make a tightly closed left fist and that she had full left thumb and finger motion, being able to oppose the tips of each of her fingers with her thumb and able to oppose the head of the 5th metacarpal with the thumb. Full motion was present in the left wrist and shoulder. It was found that the left elbow lacked 10°s of attaining flexion comparable with the right and 20°s of obtaining extension comparable to the right. Full pronation and supination were present. One hundred twenty degrees of active motion, that is in the flexion and extension range, was present in the left elbow, in comparison with 150°s in the right. There was apparently no impairment of sensation in the left hand.
“X-ray studies completed on this occasion included AP and lateral views of the left lower humerus and outlined the elbow joint proper. Study of these films is reported as follows:
“There is evidence of a healed and almost completely consolidated fracture of the distal left humeral shaft which did not apparently involve the elbow joint proper. The presence of 3 metallic screws is noted, and on the lateral view is noted a small central defect. In this view, slight forward angulation of the distal fragment is noted, and ample callus is observed both anteriorly and posteriorly. There is no evidence of absorption about the internal fixation, and the overall alignment appears satisfactory. There is possibly some hypertrophic arthritic change noted medially about the articulation between the ulna and humerus.
“Conclusion: In my opinion, there exists an approximate 20% disability of the left elbow joint in the flexion-ex-tension range but no disability in the pronation-supination range. The former range of motion is felt to constitute 60% of elbow motion, and therefore, the functional disability in the elbow approximates 12%. It is possible that some further improvement in the range of motion will occur, but in my opinion, the disability stated will likely reflect the residual impairment at the conclusion of treatment.”
After thorough consideration of all of the above related elements of damages, we think the allowance made by the district judge was somewhat too conservative, and are of the opinion that it should be increased to the extent of an additional sum of $1,000.
For the reasons assigned the judgment appealed from is amended by increasing the amount of the judgment in favor of plaintiff, Mrs. Lorraine Solomon, and against the defendant, Travelers Indemnity Company, to the full sum of $8,419, with interest thereon at the legal rate from date of judicial demand until paid, and, as amended, the judgment is affirmed at appellant’s cost.